UNITED MINE WORKERS OF
AMERICA et al.

v.

W. A. (Tony) BOYLE et al.

Appeal of Louis A. ANTAL.

UNITED MINE WORKERS OF
AMERICA, Appellant,

v.

Richard WEAVER et al. and W. A.
(Tony) Boyle et al.

Nos. 76–1871 and 76–1872.

United States Court of Appeals,
District of Columbia Circuit.

Argued 1 June 1977.

Decided 1 Sept. 1977.

Rehearing Denied Nov. 18, 1977.

Steven Jacobson, Washington, D. C., for appellants in No. 76–1872. Richard L. Trumka, Washington, D. C., was on the brief for appellant in No. 76–1872. Joseph L. Rauh, Jr., Washington, D. C., entered an appearance for appellant in No. 76–1871.

Robert Cadeaux, Washington, D. C., for appellee, W. A. Boyle, also argued for appellee Owens.

Jo V. Morgan, Jr. and William E. Rollow, Washington, D. C., were on the brief for

appellee, The National Bank of Washington, Trustee.

J. Gordon Forester, Jr., Washington, D. C., was on the brief for appellee, John Owens.

Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the Court PER CURIAM.

Dissenting opinion filed by BAZELON, Chief Judge.

PER CURIAM:

We affirm the District Court on the basis of the opinion of Judge Corcoran, 418 F.Supp. 406 (D.D.C.1976), to which reference is made for the statement of facts and the discussion of the legal issues involved. We find it necessary to write only on the point raised by the dissent, which was not discussed in Judge Corcoran's opinion, that the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501(a), represents a statement of public policy which would bar the application of the Spendthrift Trust provision of the UMWA pension fund.

We cannot interpret this provision of the statute in the same way as our dissenting colleague. The portion of section 501(a) relied on in the dissent states: *"A general exculpatory provision in the Constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body* purporting to relieve any such person of liability for the breach of the duties declared by the section *shall be void as against public policy."* (emphasis added).

We start and end by looking at the plain language of the statute. It is obvious that the spendthrift provisions of the pension trust were neither general, nor were they in the Constitution and bylaws, nor were they in the resolution of a governing body, nor were they exculpatory.

It is undeniable that the pension trust was a provision neither of the union's constitution or of its bylaws, nor was it a general resolution of the union's governing body. The pension trust is an independent

entity, not part of the UMWA, whose only connection now is the continuing funding of the trust. While not bearing upon the interpretation of the statute, it may be noted that defendant Boyle at no time was a trustee of the trust itself, and that the wrongful acts committed by Boyle had no connection with the pension trust itself.

The spendthrift provisions of the pension trust are in plain language and are neither general nor exculpatory. Spendthrift provisions in pension trusts or trusts established by personal settlors are a common financial device used to ensure that the settlors' funds go where and are used for the benefit of the beneficiary he or it intends. Such a commonly used spendthrift provision is a very limited provision, and is hardly embraced within the phraseology "a general exculpatory provision". The position of our dissenting colleague might be stronger, but only slightly stronger, if the phraseology of section 501(a) had read "any exculpatory provision," or "any provision having an exculpatory effect," but no such language was used.

We say that the position of our dissenting colleague might be only slightly stronger if such language were used, because the spendthrift provision is not only special and limited rather that "general," but in the first place it is not even "exculpatory." The American Heritage Dictionary defines "exculpatory" as "proving or tending to prove guiltless; exculpating." The basic verb "exculpate" is defined as "to clear of a charge; prove guiltless or blameless; exonerate." The meaning is traced back to the Medieval Latin "ex" (removal away from) plus culpa (guilt or blame).

Thus to come within the language of the statute here, the spendthrift provision must purport to relieve Boyle of guilt, fault, blame, or liability. The spendthrift provision does not purport to do so, and our dissenting colleague does not claim that it does. Boyle has not been exculpated in any way by the spendthrift provision. He re-mains guilty, at fault, blameworthy, and liable to the UMWA for the full amount of the judgment rendered against him. Where there is guilt, fault, blame, or liability, then various remedies arise. All that the spendthrift provision of the pension trust does is void the particular remedy of attachment. Boyle's liability remains, for which various remedies may be invoked. Boyle remains liable, and owes the UMWA the full judgment rendered; the spendthrift provision of the trust was not designed to "exculpate" him within the plain meaning of the statute.

The English language is marvelously flexible, yet precise. Had the Congress—or the settlors of the trust—at any time desired to provide for an offset of the pension ordinarily to be paid to any beneficiary of the trust by reason of any liability, specific or general, flowing from a beneficiary to the trust, either could have said so. This they did not do, and the language employed by Congress regarding "a general exculpatory provision," specifically to be found in the constitution or bylaws or resolution of the Union, plainly does not cover the spendthrift provision of the Pension Trust. That being so, we find no public policy, implicit or explicit, in section 501(a) which should cause this court to create another exception to the usual rule on spendthrift provisions.

*Affirmed.*

BAZELON, Chief Judge, dissenting:

Appellant, the United Mine Workers of America (Union), seeks to satisfy a money judgment against appellees, former Union officers found liable in an earlier proceeding for violations of the fiduciary obligation provisions of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C.A. § 501 (1970).[1] The majority affirms the district court in refusing to permit attachment of the former officers' monthly pension payments because of a spendthrift clause in the Union pension

1. The judgment against appellees for violations of 29 U.S.C. § 501 (1970) is final. *UMWA v. Boyle*, 91 LRRM 2549 (D.D.C.1975), aff'd by *order*, 181 U.S.App.D.C. 200, 556 F.2d 77 (1977).

trust agreement.[2] Since I believe enforcement of a spendthrift clause to defeat recovery under § 501 of the LMRDA is contrary to public policy, I respectfully dissent.

### I.

In an earlier proceeding, the district court found that appellees W. A. ("Tony") Boyle, George Titler, and John Owens[3] had violated § 501 of the LMRDA by diverting Union funds for use in their 1969 Union reelection campaign.[4] Specifically, appellees obtained campaign funds disguised as salary increases, and expended Union money for souvenir cigarette lighters, ball point pens, and digital clocks bearing their names and likenesses.[5] For these violations the district court found appellees jointly and severally liable to the Union for $239,993.25. The court also found appellee Boyle individually liable

for $69,870.50, representing unlawful expenditures for printing campaign propaganda and fees received for serving as the director of a union-controlled bank.[6]

To secure satisfaction of that judgment, the Union levied writs of attachment against the beneficial interests of Boyle, Titler, and Owens in a Union pension fund.[7] Appellees opposed the attachments, and filed motions with the district court to quash the writs. The court recognized that absent a spendthrift clause in the trust agreement the governing provisions of the District of the Columbia Code would authorize attachment of 25% of appellees' periodic pension payments.[8] But it ruled that paragraph 12 of the pension trust agreement established a valid spendthrift clause which barred attachment.[9]

---

2. *UMWA v. Boyle*, 418 F.Supp. 406 (D.D.C. 1976).

3. At the time of the acts giving rise to liability appellees Boyle, Titler, and Owens served as International President, Vice President, and Secretary-Treasurer of the Union, respectively.

4. 91 LRRM 2549 (D.D.C.1975).

5. 29 U.S.C. § 501(a) (1970) provides in part:
    The officers, agents, shop stewards, and *other representatives of a labor organization* occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, *taking into account the special problems and functions of a labor organization*, to hold its money and property solely for the benefit of the organization and its members and to *manage, invest, and expend the same in accordance* with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing *with such organization as an adverse party* or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest *which conflicts with the interests of such* organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted *by him or under his direction on* behalf of the organization.

6. The court found that in serving as a member of the Board of Directors Boyle was acting "on behalf of" the Union in terms of § 501, *see* note 5 *supra*, and therefore was required to account to the Union for the compensation he received. 91 LRRM at 2555.

7. The Trustee, pursuant to authority conferred by paragraph 12 of the pension trust agreement, *see* note 9 *infra*, suspended 25% of appellees' periodic pension payments pending final determination of the validity of the attachments. J.A. at 31.

8. 16 D.C.Code § 572 (1973) provides in pertinent part that an attachment levied upon wages due a judgment debtor becomes a lien and a continuing levy upon gross wages due or to become due for the amount specified in the attachment to the extent of
    (1) 25 per centum of [the employee-garnishee's] disposable wages that week, or (2) the amount by which *his disposable wages* for that week exceed thirty times the Federal Minimum hourly wage prescribed by section 6(a)(1) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206) in effect at the time the wages are payable, whichever is less.
    The D.C.Code defines "wages" to include "periodic payments pursuant to a pension or retirement program." 16 D.C.Code § 571(1) (1973). The "lesser" amount in the case of each of the appellees is 25% of their respective monthly pension payments.
    On May 3, 1976, George Titler died, thereby mooting all questions concerning his prospective pension payments. The Union still seeks to attach 25% of Titler's death benefits under the Union pension trust. J.A. at 204.

9. Paragraph 12 of the International Union United Mine Workers of America Pension Trust reads in relevant part as follows:
    No employee or retired employee shall have any right, title, or interest to any portion of the Pension Fund held by the Trustee, until

The Union concedes that paragraph 12 of the trust agreement creates a valid spendthrift clause,[10] but it argues here, as before the district court, that the spendthrift clause should not be enforced because it conflicts with the policy of the national labor relations laws as embodied in § 501 of the LMRDA.[11] The district court, for reasons that do not appear in its opinion, did not respond to this contention. Instead, it stated that the Union was seeking to establish a hitherto unrecognized exception for involuntary tort creditors, and rejected the Union's public policy argument on this basis.[12] In my view, there is ample ground for finding an exception to the spendthrift clause precisely where the district court failed to look—the public policy of § 501 of the LMRDA.

## II.

The decisions of this jurisdiction recognize the general validity of spendthrift trusts,[13] but also establish that spendthrift trusts will not be enforced when it is contrary to public policy to do so.[14] The district court acknowledged that there are a number of public policy exceptions to the enforceability of spendthrift clauses, and referred specifically to the four exceptions set forth in the *Restatement of Trusts* 2d § 157.[15] But the district court's opinion

---

actual payment to the retired employee by the Trustee. . . . No assignment, anticipation, pledge or encumbrance whatsoever shall be permitted and no attempts on the part of the retired employee to transfer or pledge his right to any payment or portion of the monthly pension herein provided shall be recognized by the Trustee. All pension payments shall be made directly into the hands of the retired employee and to no other person, nor shall any such monthly payments be subject to attachment or other legal process. If Court action should be brought to have said monthly pension paid to some other person, the Trustee in its discretion may suspend the monthly payments otherwise payable to said retired employee, pending final judicial determination. . . .

10. App.Br. at 7.

11. The Union also contends that because of appellees' domination of the Union during this period they should be considered settlors of the trust, and barred from invoking the spendthrift clause on this basis. *See American Security and Trust Co. v. Utley*, 127 U.S.App.D.C. 235, 236, 382 F.2d 451, 452 (1967); *Liberty National Bank v. Hicks*, 84 U.S.App.D.C. 198, 201, 173 F.2d 631, 634 (1948); *Restatement of Trusts 2d* § 156 (1959). Because I believe the district court should be reversed on other grounds, I do not reach this issue.

12. The court noted that there are few cases in any jurisdiction dealing with the rights of tort creditors to invade a spendthrift trust. But it conceded that commentators, with rare unanimity, support an exception for tort creditors, on the ground that it would be unfair to enforce a spendthrift clause against a tort victim who has no say as to who his debtor will be. *See* E. Griswold, *Spendthrift Trusts* 442–43 (2d ed. 1947); 2 A. Scott *Trusts* 1230–31 (3d ed. 1967); Note, 57 Dick.L.Rev. 220 (1953); Note, 28 Notre Dame L. 509 (1953); Note, 17 Okl.L.Rev.

235 (1964). Nevertheless, the court rejected an exception for tort creditors on the facts of this case, reasoning that the parties had an established relationship before the violations occurred and that the Union could have modified the spendthrift clause in anticipation of a violation. 418 F.Supp. at 411–12.

I find the district court's rationale for rejecting the applicability of a public policy exception for tort judgments doubtful. In view of the well-documented domination of the Union by appellees during the period in which the violations found by the district court occurred, *see UMWA v. Boyle*, 91 LRRM 2549, 2551 n. 5 (D.D.C.1975); *Hodgson v. UMWA*, 344 F.Supp. 17, 21 (D.D.C.1972); *Hodgson v. UMWA*, 344 F.Supp. 990, 995 (D.D.C.1972); *Weaver v. UMWA*, 80 LRRM 2596, 2599 (D.D.C.1972), it is implausible to suggest that the Union could modify the spendthrift clause in anticipation of a future judgment against appellees. It is unnecessary, however, to resolve the general question of whether this Circuit should recognize a public policy exception for involuntary tort creditors.

13. *American Security and Trust Co. v. Utley, supra*, 127 U.S.App.D.C. at 236–237, 382 F.2d at 452–53; *Seidenberg v. Seidenberg*, 96 U.S. App.D.C. 245, 246, 225 F.2d 545, 546 (1955).

14. *American Security and Trust Co. v. Utley, supra*, 127 U.S.App.D.C. at 237, 382 F.2d at 453; *Seidenberg v. Seidenberg, supra*, 96 U.S. App.D.C. 247–250, 225 F.2d at 547–50; *Buchanan v. National Savings & Trust Co.*, 79 U.S.App.D.C. 278, 280–281, 146 F.2d 13, 15–16 (1944).

15. This section reads in relevant part:

Although a trust is a spendthrift trust . . the interest of the beneficiary can be reached in satisfaction of an enforceable claim against the beneficiary,

seems to imply that the exceptions listed in § 157 are presumptively exclusive. This was clearly not the intention of the draftsmen of the *Restatement.* Comment (a) to § 157 expressly indicates that the draftsmen anticipated courts would recognize new public policy exceptions where warranted by the circumstances:

> The enumeration in this Section of situations in which the interest of the beneficiary of a spendthrift trust . . . can be reached is not necessarily exclusive. The interest of the beneficiary of a spendthrift trust . . . may be reached in cases other than those herein enumerated, if considerations of public policy so require.

Nor is there any suggestion in our prior decisions that public policy exceptions are limited to a few "traditional" contexts. Aside from their specific holdings, our decisions establish only a few basic guiding principles. Because "it does not necessarily follow from the general validity of spendthrift trusts that trust income is protected from all obligations," we have rejected "an absolutist 'all or nothing' approach" to the enforcement of spendthrift clauses. *American Security and Trust Co. v. Utley,* 127 U.S.App.D.C. 235, 237, 382 F.2d 451, 453 (1967). Instead, the important question in each case is whether, in light of the nature of the judgment sought to be enforced and the relationship between the judgment debtor and creditor, enforcement of the spendthrift clause would be "repugnant to prevailing law or public policy." *Seidenberg v. Seidenberg,* 96 U.S.App.D.C. 245, 248, 225 F.2d 545, 548 (1955). Applying these principles, we concluded in *Utley, supra,* that public policy required invasion of a spendthrift trust to satisfy a judgment for the provision of necessaries to the bene-

(a) by the wife or child of the beneficiary for support, or by the wife for alimony;
(b) for necessary services rendered to the beneficiary or necessary supplies furnished to him;
(c) for services rendered and materials furnished which preserve or benefit the interest of the beneficiary;
(d) by the United States or a State to satisfy a claim against the beneficiary.

ficiary; and in *Seidenberg, supra,* that a spendthrift trust would not bar satisfaction of a judgment against a father for child support.

Of course, spendthrift trusts should not be set aside on the basis of judicial whim or caprice. In view of the rule of this Circuit recognizing the general validity of spendthrift trusts, we should refuse to enforce such a trust on public policy grounds only when the public policy involved is clear. "Public policy is very difficult to determine in many cases, but an act of the legislature, the branch most directly in contact with public opinion, is perhaps the most satisfactory measure of this concept." *Welch v. Welch,* 166 F.Supp. 539, 541 (D.D.C.1958). We need look no further than the Act under which appellees were held liable to find a clear statement of public policy opposed to enforcement of the spendthrift clause.

Congress enacted the Labor-Management Reporting and Disclosure Act of 1959 in response to disclosures of widespread corruption and mismanagement among officials of labor organizations.[16] One of the express purposes of the Act was to ensure "that labor organizations . . . and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations . . . ." 29 U.S.C. § 401(a) (1970). Section 501 was designed to achieve this goal directly. Section 501(a) adopts common law concepts of fiduciary responsibility as part of federal labor relations law, imposing a duty of trust on union officials in their handling and investment of union funds, and making it unlawful for union officials to maintain interests in conflict with those of the Union.[17]

16. *See generally,* S.Rep. No. 187, 86th Cong., 1st Sess. (1959), *reprinted in* [1959] U.S.Code Cong. & Admin.News, p. 2318; H.R.Rep. No. 741, 86th Cong., 1st Sess. (1959), *reprinted in* [1959] U.S.Code Cong. & Admin.News, p. 2424.

17. *See* note 5 *supra.*

Congress provided stringent sanctions to enforce the obligations imposed by § 501(a). If a Union fails to bring suit for a violation of § 501(a), § 501(b) provides that "any member" of a labor organization may sue for damages, an accounting, or other relief.[18] And § 501(c) makes certain violations of § 501 punishable by fines up to $10,000 or imprisonment for up to five years.[19] The intention of Congress in imposing these civil and criminal sanctions for violation of § 501(a) was undoubtedly to compensate labor organizations for the misdeeds of union officials who abuse their positions of trust, and to deter union officials from breaching their fiduciary duty.

Congress recognized that neither the compensatory nor the deterrent purposes of the sanctions imposed by § 501 would be adequately fulfilled if union officials who violate their fiduciary duty could insulate themselves from civil damage or restitutionary awards.[20] The last sentence of § 501(a) reads:

A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for the breach of the duties declared by this section *shall be void as against public policy.* (Emphasis added.)

Because enforcing the spendthrift clause in this case would have precisely the same impact as a general exculpatory provision—insulation of the appellees from the sanctions Congress saw fit to impose for violations of § 501—I would hold that the spendthrift clause is invalid as against public policy.

Contrary to the majority's assertion, it is unnecessary to find that the spendthrift clause is a "general exculpatory" provision within the terms of § 501. Neither *Utley, supra,* nor *Seidenberg, supra,* even remotely suggests that public policy exceptions to the enforceability of spendthrift clauses must be grounded in the express language of legislative enactments. In fact, those cases relied exclusively on judicial determinations of public policy; here public policy is indicated by Congressional intent.

My conclusion that enforcement of the spendthrift clause in this case would be contrary to public policy is reinforced by considerations of equity. The Union is not seeking to satisfy a debt voluntarily contracted with its former officials but to recover Union funds unlawfully converted by these officers for their personal benefit. And the beneficial interest the Union seeks to attach is not an interest in a trust created by a third party settlor but an interest in the Union's own pension fund designed to reward employees for their faithful years of

---

**18.** 29 U.S.C. § 501(b) (1970) provides:

When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation.

**19.** 29 U.S.C. § 501(c) (1970) provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

**20.** *See Morrissey v. Curran,* 423 F.2d 393, 399 (2d Cir. 1970); *Highway Truck Drivers and Helpers Local 107 v. Cohen,* 182 F.Supp. 608, 617–18 (E.D.Pa.), *aff'd,* 284 F.2d 162 (3d Cir. 1960).

service to the Union. Enforcing the spendthrift clause in these circumstances may result in the mockery of depriving the Union of compensation for the defalcations of its former officers while forcing the Union to continue to make full monthly pension payments to these officers.[21]

I would reverse the judgment of the district court and remand with instructions to enter judgment upon the writs of attachment.

---

**21.** After deduction of 25% of the amounts payable under the pension trust appellee Owens will still receive about $825 per month, and appellee Boyle about $975 per month. Thus, even if *Seidenberg v. Seidenberg, supra,* 96 U.S.App.D.C. at 250, 225 F.2d at 550, restricts invasion of spendthrift trusts on public policy grounds to amounts that are reasonable in light of the purposes of the trust, I find nothing in the briefs or the record in this case to indicate that such a requirement would not be satisfied here.